**UNITED STATES, Appellee,**

v.

**Kang H. LEE, Specialist Four, U.S. Army, Appellant.**

No. 54,945
CM 445061.

U.S. Court of Military Appeals.

March 2, 1988.

For Appellant: *Captain Richard J. Anderson* (argued); *Lieutenant Colonel Paul J. Luedtke, Major Dale K. Marvin* and *Captain Wendell A. Hollis* (on brief); *Colonel Brooks B. La Grua* and *Captain Wayne D. Lambert.*

For Appellee: *Captain Robert R. Long, Jr.* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Richard S. Kleager* and *Captain Denise K. Vowell* (on brief); *Captain Howard G. Cooley.*

Opinion of the Court

SULLIVAN, Judge:

In August and September 1983, appellant was tried by a general court-martial composed of a military judge alone at Seoul, Korea. Contrary to his pleas, he was found guilty of violating paragraph 17a(1), United States Forces Korea (USFK) Regulation 27–5 (July 9, 1982), by transferring duty free goods to unauthorized persons,[1] and paragraph 17b by failing to show continued possession or lawful disposition of duty free goods or controlled items.[2] Art. 92, Uniform Code of Military Justice, 10 U.S.C § 892. He was sentenced to a bad-conduct discharge, confinement for 1 year, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence. The Court of Military Review affirmed the findings and all of the sentence except for the forfeitures.

This Court granted review of the following issue:

WHETHER PARAGRAPH 17b(2) AND (3) OF USFK REGULATION 27–5 WHICH REQUIRES AN ACCOUNTING OF CONTROLLED ITEMS UPON REQUEST, AND FOR VIOLATIONS OF WHICH APPELLANT WAS CONVICTED, ARE PROMULGATED CONTRARY TO CONGRESSIONAL INTENT EXPRESSED IN 10 U.S.C. § 831(a) AND ARE UNCONSTITUTIONAL PER SE IN VIOLATION OF THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF–INCRIMINATION.

We hold that appellant's conviction for failing to show his continued possession or lawful disposition of these goods or items cannot lawfully stand. See United States v. Lavine, 13 M.J. 150 (C.M.A. 1982); United States v. Seay, 1 M.J. 201, 203 (C.M.A. 1975) (lead opinion by Fletcher, C. J.). See generally W. Winthrop, Military Law and Precedents 575–76 (2d ed. 1920 Reprint).

At this court-martial Sergeant First Class James Hogans testified that he was a member of the Army Military Police Detachment-Korea and was the NCOIC of the Ration Control Enforcement Branch at the Provost Marshal's Office, Eighth Army. He stated that he received "a computer printout ... on a monthly basis" of "anyone that has made ... four or more high dollar value purchases." He then reviews the purchases made by that individual "for repetitive prices." On the basis of this information and personnel data in the person's records, he makes an initial determination whether "the purchases appear excessive for family or personal needs." He then sends out a letter to that person's commanding officer asking him to determine whether there has been an abuse of privileges. He conceded that such a "letter is

---

1. Paragraph 17a(1) states:

   17. RATION CONTROL AND PURCHASE PRIVILEGES. a. Personnel will not:

   (1) Sell, transfer, donate, pledge, pawn, loan, bail, rent, or otherwise dispose of any duty-free goods to any person not authorized duty-free import privileges under the US–ROK SOFA or other US–ROK agreements. In a prosecution under this subparagraph, it is an affirmative defense that the defendant transferred the item in conformance with USFK Reg 643–1 and 643–2.

   USFK Reg. 27–5 (July 9, 1982). See also para. 17a(1), USFK Reg. 27–5 (March 1, 1980), which is virtually identical.

2. Paragraph 17b states:

   b. Personnel will:

   (1) Upon request of the unit commander, military law enforcement personnel, responsible officer, or store security personnel, present and/or surrender their or their dependents' ration control plate, letter of authorization purchase record, or documents used in selling.

   (2) Upon request of the unit commander, military law enforcement personnel, or responsible officer, present valid and bona fide information or documentation showing the continued possession or lawful disposition (by serial number if manufactured with one) of any controlled item as listed in USFK Reg 60–1, regardless of where or how acquired, brought into Korea duty-free.

   (3) Upon request of the unit commander, military law enforcement personnel, or responsible officer, present valid and bona fide information or documentation showing the continued possession or lawful disposition of any item acquired in or brought into Korea duty-free that is not a controlled item and that costs more than $35.00.

   (4) Give the anvilled [sic] purchase record to the cashier, military police, or other authorized person before exiting the USFK facility in which the purchase was made.

   USFK Reg. 27–5 (1982). Paragraph 17b, USFK Reg. 27–5 (March 1, 1980), is virtually identical, except for an additional phrase at the end of (3).

not sent out unless" his office felt "that the person has possibly violated the regulations by over purchasing above the amount that is reasonably necessary for their own personal needs ..."

Captain Gregory Helbert testified that he had been the commander of appellant's Military Police Company. He stated that on April 1, 1983, he received a letter "from the ration control people" which alleged that appellant had purchased a rather large amount of items and an accompanying list of these items. He testified that he did not "suspect" appellant "of any crime at" that point because of the "lack of credibility in the ration control" branch and his high estimation of appellant. Moreover, he said that he did not see any need to advise appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831. Nevertheless, he summoned appellant, read him this letter, directed appellant to read this letter, *and informed him that he should "show Lieutenant Krause the presence or whereabouts of these items." Captain Helbert indicated that he ordered this action because the Provost Marshal's Office "felt that there was some abuse, and they asked"* him to determine whether such *abuse occurred.* (Emphasis added.) He further conceded that he directed two military police investigators, Murdock and Black, to accompany Lieutenant Krause to observe and assist the inspection of appellant's purchased goods.

Lieutenant David Krause testified that the company commander, Captain Helbert, gave him a list and told him to conduct "an administrative inspection." He testified that he did not suspect appellant of violating service regulations. The record indicates that he gave no warning under Article 31. He also stated that the two military police investigators accompanied him on this inspection at appellant's house. Finally, he testified that appellant failed to account for half the items on the list.

Finally, Sergeant First Class Frank Bujakowski was called by the military judge to testify as a witness for the court. He was the Noncommissioned Officer in Charge of the Customs Enforcement Section of the Provost Marshal's Office. He indicated that if a Military Police Investigator "conduct[s] a show and tell, the first thing we do is read the man his rights ..." He also testified that his office would have conduct-

ed an investigation if appellant's company commander didn't, and, accordingly, advised appellant of his rights. He first stated that if his office conducts the show and tell, it is an investigation but if it only assists the commander, it is not an investigation. He also testified that under the regulation, the commander can order an individual at any time to comply without any advisement of rights.

An initial question we must decide is whether appellant should be permitted to raise the granted issue for the first time on appeal. He did not particularly attack the lawfulness of this regulation at trial. *See* para. 171*a*, Manual for Courts-Martial, United States, 1969 (Revised edition). However, he did move that the charge of violating this regulation be dismissed because of a violation of his Article 31 rights. Moreover, he also moved that all his statements made at this so-called "show and tell" inspection be suppressed because he was a suspect and not properly advised of his Article 31 rights. Finally, the military judge expressly ruled at trial that appellant "was not a suspect" at the time of this inquiry. In this context, we hold that appellant did not waive his right to challenge the lawfulness of this regulation.

A second question we must decide is whether it is necessary to answer the granted issue in order to resolve appellant's case. Appellate defense counsel broadly asserts that paragraph 17*b*, USFK 27–5, on its face violates Article 31 and the Fifth Amendment. *See generally United States v. Kauffman*, 14 U.S.C.M.A. 283, 297–98, 34 C.M.R. 63, 77–78 (1963); *United States v. Smith*, 9 U.S.C.M.A. 240, 26 C.M.R. 20 (1958). The Government, relying on *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), argues that this regulatory program can be lawfully sustained. Although this broad question is most interesting, this case can be resolved on the more narrow ground that this regulatory program as applied to appellant was unconstitutional. *See Brockett v. Spokane Arcades*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886). *Cf. Selective Service Systems v. Minnesota Public Interest Research Group*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). *See generally Suth-*

*erland Statutory Construction* § 2.06 (Sands 4th ed. 1985 revision).

Our starting point in reaching this conclusion is the challenged regulation. Paragraph 17*b* (2) and (3), USFK 27–5, states:

b.  Personnel will:

\*    \*    \*    \*    \*    \*

(2) Upon request of the unit commander, military law enforcement personnel, or responsible officer, present valid and bona fide information or documentation showing the continued possession or lawful disposition (by serial number if manufactured with one) of any controlled item as listed in USFK Reg 60–1, regardless of where or how acquired, brought into Korea duty-free.

(3) Upon request of the unit commander, military law enforcement personnel, or responsible officer, present valid and bona fide information or documentation showing the continued possession or lawful disposition of any item acquired in or brought into Korea duty-free that is not a controlled item and that costs more than $35.00.

Paragraph 1 of this same regulation provides: "Violations of this regulation may be prosecuted under Art. 92, Uniform Code of Military Justice (UCMJ) or other appropriate articles of the UCMJ and/or appropriate administrative action may be taken..." *See also* para. 35 and *p,* USFK 60–1 (1982); para. 36 and *q,* USFK 60–1 (1981). No mention is made in this regulation of Article 31 or the Fifth Amendment or of its application to persons who are already suspected by military authorities of committing a controlled or duty-free-item offense.

Paragraph 1 of USFK 27–5 subjects "all members of the United States Armed Forces on active duty with land, sea, or air armed service of the United States of America who are physically present within" ROK to the "show and tell" inspections of paragraph 17*b* (2) and (3). *See* para. 12 *d.* However, it does not require that all these persons actually undergo this procedure and instead imparts discretion to certain government officials to select those personnel who actually do. No criteria are delineated to guide these officials in their discretionary decision. We also note that the challenged regulation imparts this regulatory authority to "the unit commander, , military law enforcement personnel, or responsible officer."

▮    In assessing the lawfulness of such a regulation, as applied to appellant, we note that such a regulation cannot be applied to appellant in derogation of his constitutional and statutory rights. *See United States v. Seay,* 1 M.J. at 203. *See generally United States v. Hutchins,* 4 M.J. 190, 192 (C.M.A.1978); *United States v. Johnson,* 1 M.J. 101, 105 (C.M.A.1975). More particularly, it is well established that if appellant was a suspect at the time of this inquiry, Article 31 precludes this regulation or orders purportedly based thereon from being used to compel him to incriminate himself. *United States v. Dupree,* 24 M.J. 319, 321 (C.M.A.1987); *United States v. Reed,* 24 M.J. 80 (C.M.A.1987); *United States v. Lavine,* 13 M.J. 150, 151 (C.M.A. 1982); *United States v. Seay, supra.* Also, law enforcement personnel cannot use this regulatory program as a pretext for obtaining evidence of crimes in violation of appellant's Fifth Amendment rights. *See New York v. Burger,* ——— U.S. ———, 107 S.Ct. 2636, 2651 n. 27, 96 L.Ed.2d 601 (1987); *Maine v. Moulton,* 474 U.S. 159, 174–76, 106 S.Ct. 477, 486–87, 88 L.Ed.2d 481 (1985).

The record in this case makes it clear that authorized law enforcement personnel asked appellant's commander to request appellant to account for certain items he purchased in Korea. The mere fact that police officers initiated or conducted these inquiries did not make appellant a suspect or the inquiry a search for criminal evidence. *See New York v. Burger, supra* 107 S.Ct. at 2651. However, here the military police focused on appellant because a computer printout showed he purchased four high-price items, after they pulled his purchase records and found repetitive purchases, and after they examined his personnel record and concluded a possible abuse of privileges had occurred. Moreover, their investigation showed that 87 items, including eight telephones, had been purchased which were valued at more than $12,000. Finally, their letter to appellant's commander expressly stated that the purchase records would be held as evidence.

▮    Clearly, appellant was a suspect for the military police at the time of this request, regardless of the euphemisms em-

ployed at trial to mollify this reality. *See United States v. Duga,* 10 M.J. 206, 210 (C.M.A.1981). *Cf. United States v. Jones,* 24 M.J. 367 (C.M.A.1987), H. Moyer, *Justice and the Military* § 2–248 (1972). Moreover, a second military police officer testified that if his office conducted the "show and tell" inquiry based on this letter, they would as a matter of practice advise such a person of his rights under Article 31. He also testified that he believed a commander could use this regulation to order appellant to respond without advising him of his rights. The military police's employment of the commander to indirectly subvert appellant's right against self-incrimination was unlawful. *Maine v. Moulton, supra. See Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

The military judge found that appellant's company commander did not consider appellant a suspect at that time and that he was simply conducting an inspection required by regulations. He also ruled that a reasonable man would not consider appellant a suspect simply on the basis of the letter from the Provost Marshal's Office. In view of the language of the letter, the listing of the items, and the amount of money involved, such a conclusion is highly questionable. (See Appendices A and B.)[3] In any event, it was plain error for the judge to fail to consider whether the military police exploited this commander to evade the requirements of Article 31 and the Fifth Amendment. Plainly they did.

The inquiry in the present case was truly grounded in compulsion. As noted above, appellant was required by this regulation to account, or face a court-martial and punishment extending to two years' confinement. He was in fact found guilty and punished for this offense. *Cf. Selective Ser. Sys. v. Minn. Pub. Int. Research Group,* 468 U.S. at 856–58, 104 S.Ct. at 3357–58. Furthermore, as a suspect of ration-control-regulation abuse, he faced a real and appreciable hazard of incrimination. *Cf. United States v. Saussy,* 802 F.2d 849, 855 (6th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987); *United States v. Flores,* 753 F.2d 1499, 1502 (9th Cir.1985); *United States v. Dichne,* 612 F.2d 632, 640 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980). In this regard, we note the Government has not responded to the defense's assertion that appellant's simple acknowledgment of purchasing items on this list was an offense. Para. 17*a* (8), (9), (11), (12), (14), USFK 27–5; *see* para. 35*h,* USFK 60–1 (1982) and para. 36*h* and *i,* USFK 60–1 (1981). Moreover, an admission of dispositions of these items to unauthorized persons would and did expose him to criminal liability as well. Para. 17*a* (1), USFK 27–5.

In summary, a legitimate administrative inquiry may not lawfully be exploited to subvert the constitutional or statutory rights of a person suspected of a crime. *Maine v. Moulton,* 474 U.S. at 176 n. 12, 106 S.Ct. at 487 n. 12. *See* Mil.R. Evid. 313(b), Manual, *supra.* We presume that the authorities who promulgated this unique regulation did not intend that it be employed as a means to force a suspect to incriminate himself. *See United States v. Seay, supra.* The fact remains, however, that the law enforcement personnel who administered this program knowingly applied it to such a person for this purpose. *Cf. Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Such government action was unlawful. *See generally* Alley, *The Overseas Commander's Power to Regulate The Private Life,* 37 Mil.L. Rev. 57, 61, 93 (1967), and cases cited therein.

The decision of the United States Army Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.[4]

---

3. Military judges must insure that all exhibits in the record are easily readable.

4. The findings of guilty to the other charge were in part based on appellant's disclosures without proper advice as to his rights under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831.

462

# APPENDIX A

HEADQUARTERS, UNITED STATES FORCES, KOREA
APO SAN FRANCISCO 96301

PMJ-SS-RCE

B: 19 April 1933

12 March 1933

SUBJECT: Repetitive Purchases of Ration Controlled Items (LE)

Commander
142d MP Company
APO 96301

1. The High Value Purchase Records, Letter of Authorization Purchase Records, and the Controlled Item Purchase Records of ___E4 K. H. LEE, 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___, a member of ___142d MP Co., APO 96301___, were part of a random sample check conducted by this office and the results are attached as inclosure 1. Analysis of repetitive purchases indicate these purchases may be excessive for personal/family needs. In order to insure their validity as evidence, the purchase cards which substantiate these purchases are maintained by the Provost Marshal, HQ USFK, Tel: 293-8300/8301. These cards may be obtained upon your request.

2. Articles purchased in the Army and Air Force Exchange Service (AAFES) facilities are imported into the Republic of Korea duty free, therefore, these purchases must be for personal or family use and must be retained in the purchaser's possession or be disposed of in accordance with USFK Regulations 643-1 or 643-2. In order to maintain the privilege of shopping in AAFES facilities, patrons are subject to show proof of possession or proper disposition of High Value Purchases, Letter of Authorization Purchases, Controlled Item Purchases, and repetitive purchases of same or similar items costing $35 or more, upon request of their commander, military law enforcement personnel, responsible officer, or other personnel acting in an official capacity. (USFK Regulation 60-1, para 35p, dtd 1 Sep 82)

3. In accordance with paragraph 39b(1), USFK Reg 60-1, request you conduct an inquiry to determine if there has been an abuse of privileges and whether the items described in Incl 1 are still in the individual's possession or have been disposed of in accordance with USFK Reg 643-1 or 643-2.

4. Request you notify this headquarters, ATTN: PMJ-SS-RCE, of the action taken on this case no later than 30 days after receipt of this letter.

FOR THE PROVOST MARSHAL:

1 Incl
as

CF: UEAG-Y, ATTN: MPI

ORIGINAL SIGNED
JOHN V. HAVENS
LTC, USA
Executive Officer

## APPENDIX B

LEE, K. H.
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, E4
142d MP Co, APO 96301

| DESCRIPTION | AMOUNT | JULIAN DATE |
|---|---|---|
| Clock Quar | 118 | 2118 |
| Clock Quar | 118 | 2118 |
| Men's Analog Quartz Watch (SEIKO) VTR | 932 | 2125 |
| Punch Bowl | 119 | 2126 |
| Telephone | 70 | 2132 |
| Telephone | 70 | 2132 |
| Telephone | 70 | 2132 |
| Telephone | 70 | 2132 |
| Clock Cack | 67 | 2172 |
| Bone China (Mikasa) 45-pc | 225 | 2175 |
| Telephone | 70 | 2203 |
| Telephone | 70 | 2203 |
| AM/FM MPX Stereo Receivers (Marantz) | 360 | 2216 |
| Bone China (Mikasa) 91-pc | 345 | 2233 |
| Bone China (Mikasa) 91-pc | 240 | 2233 |
| Sony Betamax Ultraslim Video Cassette Recorder | 941 | 2252 |
| Telephone SWE | 153 | 2286 |
| Tray Met S. | 35 | 2286 |
| Tray Met S | 35 | 2286 |
| Clk Tble P | 215 | 2287 |
| Clock Anni | 86 | 2301 |
| Marantz Portable Mini Component System | 497 | 2313 |
| Soft Vinyl Case | 32 | 2319 |
| Soft Vinyl Case | 32 | 2319 |
| Walkman Stereo Cassette Recorder | 110 | 2319 |
| Soft Vinyl Case | 32 | 2319 |
| Soft Vinyl Case | 32 | 2319 |
| Soft Vinyl Case | 32 | 2319 |
| Soft Vinyl Case | 32 | 2319 |
| Clk Tble P | 230 | 2334 |
| Telephone SWE | 153 | 2334 |
| Walkman Stereo Cassette Recorder | 110 | 2341 |
| Stereo Cassette Deck (TEAC) | 225 | 2341 |
| Clock Cuck | 67 | 2350 |
| Cordless/R | 107 | 2351 |
| Punch Bowl | 144 | 2351 |
| Tray Het S | 35 | 2351 |

*Appendix B-p.1*

E— Pending Investigation
S- APR 14 1983

REPETITIVE PURCHASES OF RATION CONTROLLED ITEMS REPORT   00170-83

LEE, K. H.
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, E4
142d MP Co APO 96301

REPORT DATE  9 March 1983

DEROS:        May 83

| DESCRIPTION | CODE | DATE OF PURCHASE | STORE NUMBER | PRICE |
|---|---|---|---|---|
| Cassette Radio | 29 | 1 Jul 81 | 100400 | $390.00 |
| Refrigerator | 76 | 4 Jun 82 | 100405 | 750.00 |
| Stereo  Music System (Marantz) | 34 | 3 Sep 82 | 100400 | 1280.00 |
| Speakers (4) (JBL) | 36 | 4 Sep 82 | 100400 | 1280.00 |
| Color Television (Gold Star) | 31 | 2 Oct 82 | 100400 | 330.00 |
| Rocker w/cushion | 22 | 14 Oct 82 | 444400 | 146.50 |
| Swivel Chairs, 2 @102.60 each | 22 | 14 Oct 82 | 444400 | 205.20 |
| Table | 22 | 14 Oct 82 | 444400 | 51.30 |
| Ginger Jar Camp | 22 | 17 Oct 82 | 444400 | 55.25 |
| Rug | 22 | 17 Oct 82 | 444400 | 356.50 |
| Cassette Player (Sam Sung),2 @33.00 ea | 22 | 15 Apr 82 | 100400 | 66.00 |
| Swivel Chairs, 2 @189.00 each | 22 | 17 Apr 82 | 444400 | 378.00 |
| VTR Blank Tape (Sony) | 22 | 23 Apr 82 | 100400 | 54.00 |
| Screen | 22 | 1 May 82 | 444400 | 135.00 |
| Cassette Player (Sam Sung),2 @44.00 ea | 22 | 5 May 82 | 100400 | 88.00 |
| Toshiba KT-S1 | 22 | 5 May 82 | 100400 | 72.00 |
| Toshiba KT-S1 | 22 | 5 May 82 | 100400 | 72.00 |
| Video Rack (Sony) | 22 | 12 May 82 | 100400 | 56.00 |
| VTR Blank Tape (Sony) | 22 | 13 May 82 | 100400 | 54.00 |
| TV Monitor (Sony) | 22 | 14 May 82 | 100400 | 550.00 |
| TV Tuner (Sony) | 22 | 14 May 82 | 100400 | 360.00 |
| TV Speaker (Sony) | 22 | 14 May 82 | 100400 | 82.50 |
| Bino Cular | 22 | 15 May 82 | 100402 | 35.00 |
| Cassette Player (AIWA) | 22 | 27 May 82 | 100402 | 115.00 |
| Coleman Cooler | 22 | 29 May 82 | 100402 | 35.00 |
| Ice Box | 22 | 16 Jun 82 | 100402 | 35.00 |
| Car Speaker (Kenwood) | 22 | 12 Aug 82 | 100400 | 74.00 |
| Bino Cular | 22 | 13 Sep 82 | 100402 | 37.00 |
| VTR Camera (Sony) | 22 | 20 Sep 82 | 100400 | 779.00 |
| VTR Tuner (Sony) | 22 | 20 Sep 82 | 100400 | 295.00 |
| Carring Case for VTR (Sony) | 22 | 20 Sep 82 | 100400 | 190.00 |
| Carring Case for VTR (Sony) | 22 | 23 Sep 82 | 100400 | 190.00 |
| Heater | 22 | 15 Oct 82 | 100400 | 90.00 |
| Carring Case for VTR (Sony) | 22 | 21 Oct 82 | 100400 | 180.00 |
| Room Heater | 22 | 22 Oct 82 | 100400 | 95.00 |
| Bino Cular | 22 | 23 Oct 82 | 100402 | 46.00 |
| Tire | 22 | 6 Nov 82 | 130100 | 135.00 |
| Speaker | 22 | 11 Nov 82 | 130100 | 72.00 |
| Carring Case for VTR (Sony) | 22 | 19 Nov 82 | 100400 | 180.00 |
| TV Monitor (Sony) | 22 | 20 Nov 82 | 100400 | 450.00 |
| TV Tuner (Sony) | 22 | 20 Nov 82 | 100400 | 330.00 |
| Heater | 22 | 20 Nov 82 | 100400 | 95.00 |
| Speaker for TV (Sony) | 22 | 20 Nov 82 | 100400 | 51.00 |
| Rack (Sony) | 22 | 20 Nov 82 | 100400 | 90.00 |

Incl 1

*Appendix B - p. 2*

G—a—ation Exhibit
(War Identification)
8

S: APR 19 1983

REPETITIVE PURCHASES OF RATION CONTROLLED ITEMS REPORT ___00120-83_____

LEE, K. R.
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, E4
142d MP Co APO  96301

REPORT DATE  __9 March 1983__

VEROS: ____May 83____

| DESCRIPTION | CODE | DATE OF PURCHASE | STORE NUMBER | PRICE |
|---|---|---|---|---|
| Rack (Sony) | 22 | 20 Nov 82 | 100400 | 90.00 |
| Rack (Sony) | 22 | 20 Nov 82 | 100400 | 90.00 |
| Table | 22 | 9 Dec 82 | 100405 | 400.00 |
| Arm/C, 2 @170.00 each | 22 | 9 Dec 82 | 100405 | 340.00 |
| Side/C, 4 @155.00 each | 22 | 9 Dec 82 | 100405 | 620.00 |
| Space Heater (Toyotomi) | 22 | 29 Dec 82 | 100400 | 90.00 |

| TO | Initial | Date |
|---|---|---|
| NCOIC | | |
| O | | |
| TYPIST | | |

*Appendix B -p. 3*

EVERETT, Chief Judge (concurring):

A treaty with the Republic of Korea requires American officials to cooperate in the enforcement of Korean customs laws. To fulfill these treaty obligations, military authorities have promulgated paragraph 17 of USFK Regulation 27–5, which prohibits disposition of duty-free goods "to any person not authorized duty-free import privileges" and provides enforcement mechanisms.

Even treaty obligations, however, cannot override the Constitution and the Bill of Rights. For this reason, the NATO Status of Forces Agreement did not create military jurisdiction to try civilian dependents and employees accompanying American forces overseas. *Cf. Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Likewise, the treaty with Korea does not displace the privilege against self-incrimination, which is protected both by the Fifth Amendment and by Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831.*

The principal opinion makes clear that Lee's prosecution for violating subparagraphs 17*b* (2) and (3) of USFK Regulation 27–5 contravened the Fifth Amendment and Article 31. Even though accountability is part of military life, appellant's failure to "present valid and bona fide information or documentation" "[u]pon request of the unit commander, military law enforcement personnel, or responsible officer" cannot be punished as a separate offense under Article 92, UCMJ, 10 U.S.C. § 892. However, specification 3 of the Charge attempts to do this very thing.

The dissent refers to *South Dakota v. Neville*, 459 U.S. 553, 560, 103 S.Ct. 916, 920–21, 74 L.Ed.2d 748 (1983), a criminal trial for drunk driving in which the prosecution was allowed to comment on the defendant's refusal to take a blood test. *Neville* would be more in point if it had involved a prosecution for failing to take the blood test—a prosecution which, so far as I know, has not been authorized in any juris-

diction—or if the present case had involved solely a trial for wrongful disposition of duty-free goods and comment by trial counsel on the accused's failure to explain satisfactorily what had become of those goods. More importantly, a blood test has no testimonial characteristics, *see* 459 U.S. at 559–61, 103 S.Ct. at 920–21; and there is no testimonial compulsion in violation of the Fifth Amendment when someone is forced to submit to a blood test.

On the other hand, subparagraphs 17*b* (2) and (3) required Lee to engage in conduct which would be the functional equivalent of testimony. To "present valid and bona fide information or documentation showing the continued possession or lawful disposition of" duty-free goods involves an exercise of mental faculties—an activity quite different from extending an arm for the drawing of blood or from blowing air into a breathalyzer. The act which Lee was asked to perform is like the identification of a suspect's clothing, which has been repeatedly held to violate Article 31 of the Uniform Code of Military Justice. *United States v. Williams*, 10 U.S.C.M.A. 578, 28 C.M.R. 144 (1959); *United States v. Bennett*, 7 U.S.C.M.A. 97, 21 C.M.R. 223 (1956); *United States v. Taylor*, 5 U.S.C.M.A. 178, 17 C.M.R. 178 (1954).

Of special relevance here is *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), which held that the owner of several sole proprietorships could not be compelled to respond to a subpoena of his business records when, by doing so, he would attest to the existence of the records and their genuineness. Justice Powell's majority opinion explains:

Although the contents of a document may not be privileged, the act of producing the document may be. *Id.*, [425 U.S.] at 410 [96 S.Ct. at 1581]. A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect. As we noted in *Fisher [v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ]:

States if the fruits thereof are to be admissible in an American court-martial. *See United States v. Morrison*, 12 M.J. 272 (C.M.A.1982); *United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980); *United States v. Schnell*, 1 M.J. 94 (C.M.A.1975). *See also* Mil.R.Evid. 311(c), Manual for Courts-Martial, United States, 1969 (Revised edition).

---

* Contrary to the suggestion in the dissenting opinion, whether Korean officials could have required appellant to account under Korean law is not relevant to whether American officials may do so under United States law. Once American officials become actively involved in foreign officials' activity, that activity must fully comply with the Constitution of the United

"Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena. *Curcio v. United States*, 354 U.S. 118, 125 [77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225] (1957). The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the taxpayer are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment. These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof." *Id.*, [425 U.S.] at 410 [96 S.Ct. at 1581]. 465 U.S. at 612–13, 104 S.Ct. at 1242.

In the present case, the presentation of "valid and bona fide information or documentation" required by the regulation would have "testimonial aspects and an incriminating effect." Moreover, a failure to present the "information or documentation" is given the testimonial aspect of constituting an implied admission by the accused that no such data exist; and, in turn, this admission is the sole basis for convicting him of violating the regulation.

A regulation may properly require that records be maintained of business transactions. *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). Such records are not protected by a Fifth Amendment privilege, *see United States v. Doe, supra* 465 U.S. at 612, 104 S.Ct. at 1242; and so they are subject to reasonable searches and seizures. However, to require that a servicemember "present valid and bona fide information or documentation" goes beyond mere record keeping and, under *Doe*, is impermissible.

Under the Fifth Amendment and Article 31 of the Uniform Code, subparagraphs 17 *b* (2) and (3) of USFK Regulation 27–5, as presently drafted, cannot be made the basis for trial by court-martial under Article 92 of the Uniform Code. Therefore, I concur fully with the principal opinion.

COX, Judge (concurring in part and dissenting in part):

First of all, we have not answered the granted issue. Chief Judge Everett finds that "USFK Regulation 27–5 contravened the Fifth Amendment and Article 31," Uniform Code of Military Justice, 10 U.S.C. § 831. 25 M.J. at 462. Judge Sullivan says, "Although this broad question [i.e., the granted issue] is most interesting, this case can be resolved on the more narrow ground that this regulatory program as applied to appellant was unconstitutional." 25 M.J. at 460. We have at least eighteen more cases which ask the same question and will be remanded to the Court of Military Review. In due course, we will have to resolve this issue ourselves.

I agree with Judge Sullivan that appellant was suspected of an offense under the Code at the time that his commanding officer questioned him. Accordingly, I would suppress the statements he made to the officer. This would require reversal as to specification 1 of the Charge. I disagree that reversal is required as to specification 3 of the Charge.

I respectfully disagree with the opinion of Chief Judge Everett.

There is an old adage that bad facts make bad law. These are bad facts. However, if we cut through the facts to look at the law, the case is quite simple in my judgment.

The charge lies under Article 92, UCMJ, 10 U.S.C. § 892. Specification 3 charges appellant with violation of a general regulation, paragraph 17*b* (2) and (3), USFK Regulation 27–5, which requires personnel to "present valid and bona fide information or documentation showing the continued possession or lawful disposition of" duty-free goods either brought into the country or acquired therein. As stated by Judge Sullivan, appellant was asked to show this documentation but could not. He was convicted of violating this regulation.

This Court granted appellant's request that we determine whether this regulation was "promulgated contrary to congressional intent expressed in 10 U.S.C. § 831(a) and" is "unconstitutional *per se* in violation of the Fifth Amendment privilege against self-incrimination." Chief Judge Everett says the regulation is unconstitutional; Judge Sullivan has declined to answer the question; and I believe the regulation is lawful and enforceable against appellant.

I write to set forth my views as to why this regulation is lawful and to disagree with Chief Judge Everett.

As a point of beginning, we should look at the elements of the offense, which are:

(a) that there was a certain general order or regulation;

(b) that the accused had a duty to obey it; and

(c) that the accused violated or failed to obey the order or regulation.

Para. 171a, Manual for Courts-Martial, United States, 1969 (Revised edition).

Chief Judge Everett says that the regulation was unlawful; hence, the first element has not been proven. Judge Sullivan says that, because the accused was a suspect, his rights under Article 31 were violated. Therefore, he had no duty to obey the unlawful order. Thus the second element has not been proven.

I look first at Chief Judge Everett's view of the regulation and re-create his syllogism. His major premise is that unconstitutional regulations cannot be prosecuted. His minor premise is that paragraph 17b (2) and (3), USFK Regulation 27–5, is unconstitutional. Therefore, violations of paragraph 17b (2) and (3), USFK Regulation 27–5, cannot be prosecuted. His logic is flawless if you accept his minor premise.

As I read his opinion, he finds the regulation is unconstitutional because it requires an act of production. He equates this act of production with compulsion to produce incriminating testimony; thus in his view the regulation violates Article 31 and the Fifth Amendment to the Constitution. *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *cf. United States v. Roa*, 24 M.J. 297, 301 (C.M.A. 1987) (Everett, C.J., concurring in the result).

I respectfully submit that this premise is incorrect. First, the regulation is violated by a failure of an accused to act in response to an inquiry. There is nothing which requires him to speak or testify. The regulation requires an accused to produce duty-free goods or documentation, such as customs receipts, bills of sale, postal receipts, shipping invoices. Production of these documents, if they are lawful documents, does not incriminate him. If he produces bogus documents or even legitimate documents showing unlawful disposition, *i.e.*, sale of duty-free goods to an ineligible purchaser, then he has disobeyed the order. The documents do not incriminate him as to the regulation. Lastly, *all disobedience cases are proved by showing his act of disobedience, the failure of an accused to obey. His act of disobedience always incriminates him.* It is an element of the offense; indeed it is the offense.

If you read the regulation, it is clear that *one never incriminates himself if he obeys* because to obey, he must produce lawful documentation. To the contrary, disobedience never compels one to produce any testimony against himself. You cannot obey the regulation and at the same time incriminate yourself. In any event, if the act of production of lawful or bona fide documents could somehow incriminate a servicemember, he would arguably have a viable defense to the charge. *Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *United States v. Saussy*, 802 F.2d 849 (6th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987). I would agree that the compelled evidence, if incriminating, could not be used against him as to the substantive offense of black-marketing (specification 1 of the Charge). I am concerned only with his duty to obey the law regarding proof of lawful ownership or disposition.

Chief Judge Everett has created a new twist to defending disobedience cases. He would forgive a criminal from obedience if some other crime has made obedience impossible. For example, assume a servicemember sold his identification card to a terrorist member of the Red Brigade. Later, he is ordered to produce his identification card. He refuses, basing his refusal on his right to remain silent as to what he has done with his identification card. I agree that he cannot be ordered to incriminate himself under Article 31 and explain what he did with his card, but that does not excuse his disobedience of an order to produce it.

Likewise, here I agree that appellant cannot be compelled to give a statement as to what he has done with the goods, but he has disobeyed the regulation when he fails to produce the valid documents or the goods. This is where I part company with Judge Sullivan.

As I understand Judge Sullivan's syllogism, he would make as his major premise the proposition that regulations, even though lawful, cannot be used for unlawful

purposes. As his minor premise, he states that in this case the regulation was used to compel appellant to incriminate himself in violation of Article 31. Therefore, he concludes that appellant cannot be convicted either of violating the regulation or of the substantive offense of black-marketing (specification 1 of the Charge).

I agree with the major and minor premise as espoused by Judge Sullivan. However, I find his logic to be flawed. In every syllogism there must be a common or middle term in each premise which is excludable in the conclusion. If this were the case, his conclusion should logically be that the regulation was used unlawfully. I agree with this conclusion.

If the regulation is used unlawfully, then what is the remedy? Judge Sullivan believes the remedy is to reverse as to both specifications. I am of the opinion that Article 31(d), which is the military *exclusionary* rule, provides the remedy. *See United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), for like treatment of Fifth Amendment violations. If that be the case, then the tainted confession and the fruits thereof should be excluded. That leaves us, however, with a violation of paragraph 17*b* (2) and (3) of the regulation. The violation was not predicated on his incriminating statements but on his disobedience of the order to produce the goods or a bona fide explanation of their disposition.[1]

That leaves me to analyze the regulation to determine if it is indeed a lawful exercise of command authority in Korea. USFK Regulation 27–5 (July 9, 1982) is a punitive, "Legal Services" regulation proscribing a miscellany of misconduct, including customs and ration-control violations. *Cf. United States v. Scott*, 22 U.S.C.M.A. 25, 46 C.M.R. 25 (1972); *United States v. Nardell*, 21 U.S.C.M.A. 327, 45 C.M.R. 101 (1972). At paragraph 17*a*, the regulation forbids a person to

(1) [s]ell, transfer, donate, pledge, pawn, loan, bail, rent, or otherwise dispose of any duty-free goods to any person not authorized duty-free import privileges under the US–ROK SOFA or other US–ROK agreements[,]

except as permitted by certain other regulations not applicable here.[2]

Most pertinent to this appeal, paragraph 17*b* of the regulation requires that—

Personnel will:

\*    \*    \*    \*    \*    \*

(2) Upon request of the unit commander, military law enforcement personnel, or responsible officer, present valid and bona fide information or documentation showing the continued possession or lawful disposition (by serial number if manufactured with one) of any controlled item as listed in USFK Reg 60–1, regardless of where or how acquired, brought into Korea duty-free.

(3) Upon request of the unit commander, military law enforcement personnel, or responsible officer, present valid and bona fide information or documentation showing the continued possession or lawful disposition of any item acquired in or brought into Korea duty-free that is not a controlled item and that costs more than $35.00.

Specification 3 of the Charge alleged that appellant violated paragraph 17*b* "by fail-

---

1. It is quite clear that the Fifth Amendment protections do not apply to non-testimonial conduct. For example, the following can be required of a person notwithstanding the fact that it will incriminate him:

Blood samples: *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Refusal to take blood test may be used as evidence in DUI: *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). It's worth reading for its analysis of the Fifth Amendment.

Voice exemplars: *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 2926, 18 L.Ed.2d 1149 (1967), *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

Handwriting exemplars: *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1966); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

Duty to report hit and run: *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971).

Urine sample: *Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983). Note: Chief Judge Everett relied upon *Neville* and *Schmerber* to find no Fifth Amendment protection.

Contents of Business Records: *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

2. It was under this provision that appellant was charged with black-marketing in specification 1 of the Charge.

ing ... to present valid and bona-fide information or documentation showing the continued possession or lawful disposition of [listed] duty-free controlled items."

Obviously, paragraph 17*b* was designed as an enforcement mechanism for the overall ration-control regulatory scheme.[3] As such, it and the other regulations are an attempt to implement the United States-Republic of Korea Mutual Defense Treaty[4] and Status of Forces Agreement.[5] It is the application to the facts of this case of the so-called "show and tell" aspect of paragraph 17*b* that offends my Brothers.

Clearly, it has been the policy of the United States to make available to its servicemembers overseas and their dependents—often at very reasonable rates—a broad range of goods and services of the sort that might be found in the United States, but which may not be readily available in the host nation. Doubtless, the intent of the policy was to foster reasonable living standards for our servicemembers and their families and—not incidental-

ly—to enhance thereby the morale and effectiveness of the armed forces.

At the same time, our Government has been sensitive to the legitimate needs of our allies to preserve their sovereignty and the integrity of their own domestic economies. In order to strike this delicate balance, the Commander, U.S. Forces Korea, in effect, has, imposed on our servicemembers, as a *quid pro quo*, the affirmative duty to account, while in country, for many of the amenities purchased duty-free.

In reality, all that the agreements and implementing regulations pertinent here seek to accomplish is to shift the customs barrier of the Republic of Korea from a territorial basis to a person-to-person basis. This is necessitated by the location of U.S. personnel inside the normal customs checkpoints, with the direct pipeline to them of duty-free goods. "Necessitated" may be too strong a word, of course, since our Government always has the option of choosing not to provide this level of sup-

---

**3.** *E.g.,* USFK Reg. 60–1 (Oct. 1, 1982 and March 24, 1981) describes the basic regulatory framework for ration-control procedures involving military exchange services. USFK Regs. 643–1 (May 4, 1982) and 643–2 (May 4, 1982) and preceding versions establish the permissible conditions for transfer of duty-free import goods to persons entitled to, and persons not entitled to, duty-free import privileges in the Republic of Korea.

**4.** Article IV of the treaty, effective November 17, 1954, provides:

The Republic of Korea grants, and the United States of America accepts, the right to dispose United States land, air and sea forces in and about the territory of the Republic of Korea as determined by mutual agreement.
5 U.S.T. 2368, 2373, T.I.A.S. No. 3097.

**5.** Article IX of that agreement, effective February 9, 1967, provides, in part:

6. Except as such disposal may be authorized by the authorities of the United States and of the Republic of Korea in accordance with mutually agreed conditions, goods imported into the Republic of Korea free of duty shall not be disposed of in the Republic of Korea to persons not entitled to import such goods free of duty.

\*    \*    \*    \*    \*    \*

8. The United States armed forces, in cooperation with the authorities of the Republic of Korea, shall take such steps as are necessary to prevent abuse of privileges granted to

the United States armed forces, members of such forces, the civilian component, and their dependents in accordance with this Article.

9.(a) In order to prevent offenses against laws and regulations administered by the customs authorities of the Government of the Republic of Korea, the authorities of the Republic of Korea and the United States armed forces shall assist each other in the conduct of inquiries and the collection of evidence.

(b) The United States armed forces shall render all assistance within their power to ensure that articles liable to seizure by, or on behalf of, the customs authorities of the Government of the Republic of Korea are handed over to those authorities.

(c) The United States armed forces shall render all assistance within their power to ensure the payment of duties, taxes, and penalties payable by members of such forces or of the civilian component, or their dependents.

(d) The authorities of the United States armed forces shall provide all practicable assistance to the customs officials dispatched to military controlled piers and airports for the purpose of customs inspection.

(e) Vehicles and articles belonging to the United States armed forces seized by the customs authorities of the Government of the Republic of Korea in connection with an offense against its customs or fiscal laws or regulations shall be handed over to the appropriate authorities of such forces.
17 U.S.T. 1677, 1684–85, T.I.A.S. No. 6127.

port for our servicemembers and their dependents. That apart, there would seem to be little doubt that appellant could have been required by Korean customs officials to account for his duty-free purchases. After all, any U.S. citizen traveling abroad is obliged to respect the laws of the countries visited. If then, as a result of a bilateral agreement, this customs authority is shared by U.S. military officials, at least where U.S. servicemembers are concerned, it would seem that appellant has little ground to complain.

In any event, U.S. citizens are frequently compelled to provide information to the Government, even though the information may in some sense link them to crime, without infringement of their right against self-incrimination. As a plurality of the Supreme Court recently observed:

Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.

An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion.[6]

In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.

*California v. Byers*, 402 U.S. 424, 427–28, 91 S.Ct. 1535, 1537–38, 29 L.Ed.2d 9 (1971). In *Byers*, a statute which required the driver of a motor vehicle involved in an accident to stop at the scene and report his name and address survived a Fifth Amendment challenge.

In *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), it was a federal offense to be a member of the Communist Party, and the Board had ordered petitioners to register as communists and to file membership lists. The Court held the order violated petitioners' privilege against self-incrimination because it was "directed at a highly selective group inherently suspect of criminal activities," and "[p]etitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the ... questions in context might involve the petitioners in the admission of a crucial element of a crime." 382 U.S. at 79, 86 S.Ct. at 199. *See also Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

*Albertson* was contrasted with *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (bootlegger's refusal to file an income tax return held to be unprotected by the privilege against self-incrimination), because "the questions in the income tax return were neutral on their face and directed at the public at large." 382 U.S. at 79, 86 S.Ct. at 199. In my opinion, the facts in the instant case are much closer to *Byers* and *Sullivan* than they are to *Albertson, et al.*, because there is nothing "inherently suspect" or "criminal" about purchasing duty-free items at military-sponsored outlets. *Cf. United States v. Heyward*, 22 M.J. 35, 37 (C.M.A.1986) (servicemember's right against self-incrimination infringed by duty to report crimes of others, where crime was use of drugs, and accused was using drugs with the others).

Furthermore, in military society, duties, obligations, and restrictions of a sort that would not conceivably be permitted in civilian society are routinely encountered. *E.g.*, Arts. 85–92, 94, 99–100, 133–34,

---

**6.** *Citing Shapiro v. United States*, 335 U.S. 1, 68   S.Ct. 1375, 92 L.Ed. 1787 (1948).

UCMJ, 10 U.S.C. §§ 885–92, 894, 899–900, 933–34, respectively; Mil.R.Evid. 313, Manual, *supra; Murray v. Haldeman,* 16 M.J. 74 (C.M.A.1983). Thus, in *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (service regulation restricted indoor wearing of headgear, including petitioner's yarmulke), the Court reasoned:

> Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps. *See, e.g., Chappell v. Wallace,* ... [462 U.S. 296 (1983)] at 300 [103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586]; *Greer v. Spock,* 424 U.S. 828, 843–844 [96 S.Ct. 1211, 1220, 47 L.Ed.2d 505] (1976) (POWELL, J., concurring); *Parker v. Levy,* ... [417 U.S. 733 (1974)] at 744 [94 S.Ct. 2547, 2556, 41 L.Ed.2d 439]. The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service." *Orloff v. Willoughby,* ... [345 U.S. 83 (1953)] at 92 [73 S.Ct. 534, 539, 97 L.Ed. 843].

These aspects of military life do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment. *See, e.g., Chappell v. Wallace, supra,* [462 U.S.] at 304 [103 S.Ct. at 2367]. But "within the military community there is simply not the same [individual] autonomy as there is in the larger civilian community." *Parker v. Levy, supra,* [417 U.S.] at 751 [94 S.Ct. at 2559].

In my view, the duty to account here is not fundamentally distinct from numerous other such duties incumbent on servicemembers, such as the duty of commanders or property-book officers to account for their assets; the duty of supervisors to account for the whereabouts and activities of their subordinates; the duty of club managers to account for revenues and expenses; the duty of individual servicemembers to account for their issued military gear. I trust that my Brothers would not bar a commander from disciplining subordinates for failing to render these accountings when ordered—even if the commander suspected that, willfully or through neglect, the servicemember would be unable to comply. *Cf. South Dakota v. Neville,* 459 U.S. 553, 560, 103 S.Ct. 916, 920–21, 74 L.Ed.2d 748 (1983) (state may punish suspected drunk drivers for failing to submit to blood-alcohol test).

The same result should be reached here, where there was nothing illegal about the purchase of duty-free items; the need to curb U.S.-generated black-marketing was clear and justifiable; and the duty to remain accountable for the purchases while in country was both reasonable and proportionate. In my view, a soldier may be ordered to render such an accounting, and, absent a valid excuse or explanation, he may be punished for failure to perform that accounting. Therefore, I would affirm appellant's conviction of specification 3 of the Charge.

I agree with my Brothers, however, regarding specification 1 of the Charge. On this record, appellant was, as a matter of law, a suspect of violating the ration-control regulations at the time the "show and tell" procedure was activated. To say that he was a suspect for rights'-advisement purposes is not to suggest, however, that there was probable cause to believe that he had committed an offense. Nonetheless, the statements elicited from appellant at his apartment, without benefit of rights' waivers, were tainted. Art. 31(b). Further, as nothing intervened to purge the taint, the confessions taken by police officials shortly thereafter were improperly received in evidence. Art. 31(d); Mil.R.Evid. 304(a) and (c)(3), Manual, *supra; United States v. Butner,* 15 M.J. 139, 144 (C.M.A. 1983), *citing United States v. Seay,* 1 M.J. 201, 204 (C.M.A.1975)(lead opinion by Fletcher, C.J.). As these latter confessions constituted the heart of the Government's black-marketing case, I join my Brothers in setting aside appellant's conviction of specification 1 of the Charge. *See* n. 2, *supra.*

Thus, while I am persuaded that the order to account for purchases was lawful and that appellant was properly convicted of failing to satisfy the regulatory requirement, the use of specific statements elicited from him in violation of his constitutional and codal rights cannot be justified by similar military necessity.