**UNITED STATES**

v.

**Staff Sergeant Gamal A. HILTON, FR 374–64–3189, United States Air Force.**

**ACM S27401 (f rev).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 14 Nov. 1986.

Decided 24 Jan. 1990.

Appellate Counsel for appellant: Colonel Richard F. O'Hair and Major Frank J. Spinner.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni and Major Terry M. Petrie.

Amici Curiae: Captain A.R. Philpott, U.S.N.; Captain D.H. Sullivan, U.S.M.C.R. and Lieutenant T.E. Miro, U.S.N.R. (on brief), for the Navy–Marine Corps Appellate Defense Div. Commander Thomas W. Osborne, U.S.N. and Lieutenant Charles A. Polen, U.S.N.R. (on brief), for the Navy–Marine Corps Appellate Government Div.

Before HODGSON, FORAY, BLOMMERS, SPILLMAN, LEONARD, KASTL, MURDOCK and PRATT, Appellate Military Judges, En Banc.

## DECISION UPON FURTHER REVIEW

BLOMMERS, Senior Judge:

This case has again been remanded to us by the United States Court of Military Appeals for consideration of the constitutionality of provisions in a general regulation that require members of the U.S. forces in the Republic of the Philippines (hereinafter referred to as RP) to show possession or authorized disposition of tax-exempt property when directed to do so by cognizant authorities.[1] Before addressing the constitutional issues, a matter which arose following remand should first be resolved.

I

Upon further review, a concern arose as to whether or not USCINCPACREPPHILINST 4066.7Q, dated 16 August 1984, which the appellant was charged and convicted of violating, was a "lawful" general regulation since it had been signed *by* the Chief of Staff of CINCPACREPPHIL (who we ascertained was a Navy captain (O–6)), *as* Chief of Staff. The authority purporting to promulgate the regulation appears as: "/s/, A.L. Shapero, Chief of Staff." We specified this issue to counsel:

> IS USCINCPACREPPHILINST 4066.7Q, DATED 16 AUGUST 1984, AND SIGNED BY THE CHIEF OF STAFF OF CINCPACREPPHIL, AS THE CHIEF OF STAFF, A LAWFUL GENERAL REGULATION, SINCE IT WAS NOT SIGNED "AT THE DIRECTION OF" OR "FOR" CINCPACREPPHIL, AND U.S. NAVY REGULATIONS 1973, CHAPTER 6, PARAGRAPH 0602 GIVES ONLY COMMANDERS THE AUTHORITY TO ISSUE REGULATIONS AND PARAGRAPH 0608 STATES CHIEFS OF STAFF HAVE NO COMMAND AUTHORITY OF THEIR OWN?

We also invited the Navy–Marine Corps Appellate Review Activity to submit amicus briefs on this issue. Both the Navy–Marine Corps Appellate Defense and Appellate Government Divisions have submitted briefs. We are thankful for their assistance in helping us resolve this issue.

---

1. *Case History.* The appellant was tried by special court-martial in November 1986 for violating a merchandise control regulation by failing to show possession or authorized disposition of a tax-exempt motor vehicle. Contrary to his pleas, he was found guilty as charged, and was sentenced to a bad conduct discharge, confinement for two months, and reduction from Staff Sergeant (E–5) to Airman (E–2). The convening authority approved the sentence. On 27 May 1987 the findings and sentence were affirmed by this Court in a short-form opinion. The only matter raised before us related to sentence appropriateness. The record was submitted for review before the United States Court of Military Appeals on its merits. The petition for review was granted and the Court specified the following issue (25 M.J. 206): Whether the regu-

lation which the accused disobeyed violated his rights under the Fifth Amendment and Article 31, UCMJ, 10 U.S.C. § 831. By Order dated 2 March 1988, the case was remanded to us for further review in light of the constitutional issue raised (26 M.J. 165). By decision dated 27 April 1988, we held that since the constitutional issue involved had not been raised at trial it was waived for the purposes of appellate review (26 M.J. 635). On 9 January 1989, the Court of Military Appeals held that the appellant's failure to raise the constitutional and statutory questions at issue during the trial did not preclude their consideration by appellate authorities (27 M.J. 323). Therefore, the case was again remanded to us for consideration of those questions.

## A

■ The appellant was charged under Article 92(1), UCMJ, 10 U.S.C. § 892(1), which proscribes violation of or failure to obey a lawful general order or regulation. "A general order or regulation is lawful unless it is contrary to the Constitution, the laws of the United States, or lawful superior orders or for some other reason *is beyond the authority of the official issuing it.*" MCM, Part IV, para. 16c(1)(c) (1984) (emphasis added). The authority to issue general orders and regulations includes "those orders or regulations generally applicable to the command of the officer issuing them ... which are issued by: (i) an officer having general court-martial jurisdiction; (ii) a general or flag officer in command; or (iii) a commander superior to (i) or (ii)." MCM, Part IV, para. 16c(1)(a) (1984). CINCPACREPPHIL, as a flag officer having general court-martial jurisdiction,[2] can issue general orders and regulations; his Chief of Staff, acting in his own right, cannot. The Manual for Courts-Martial itself makes no provision for delegation of authority with regard to command issued general orders and regulations.

The Navy regulations we referenced in specifying this issue seem to reinforce this distinction. United States Navy Regulations 1973, Chapter 6, paragraph 0602 (dealing with the responsibility and authority of a commander) provides in part: "Subject to orders of higher authority, a commander shall issue such regulations and instructions as may be necessary for the proper administration and operation of his command." Paragraph 0608 (dealing with authority and responsibility of officers of a commander's staff) provides in part:

> The officers of a staff shall be responsible for the performance of those duties assigned to them by the commander and shall advise him on all matters pertaining thereto. In the performance of their staff duties they shall have no command authority of their own. In carrying out such duties, they shall act for, and in the name of, the commander.

It further provides that, except for a deputy or vice commander responsible directly to the commander, the chief of staff is the senior staff officer and responsible for supervising and coordinating the work of the staff.

■ Navy appellate government counsel point out in their amicus brief that Navy regulations do provide for delegation of a commanding officer's signature authority. Secretary of the Navy Instruction (SECNAVINST) 5216.5C, *Department of the Navy Correspondence Manual*, Chapter 2, para. 17 (24 August 1983). When subordinates sign documents under delegated authority, they usually do so "By Direction." Air Force regulations provide similar signature delegation authority. Such documents are usually signed "FOR THE COMMANDER," or the commander's signature block (name, rank and title) will appear on the document above the signature block of the official who actually signs it. *See* Air Force Regulation 5-8, *Preparing Air Force Publications*, para. 1-3 and Fig. 2-5 (27 April 1984); AFR 10-7, *Administrative Orders*, para. 1-7 and Fig. 1-1 (15 September 1986); AFR 35-54, *Appointment to and Assumption of Command*, paras. 10 and 11 (29 April 1988).[3] In fact, the Clark

---

**2.** The flag officer assigned to this billet holds three command positions concurrently: Commander, U.S. Facility Subic Bay; Commander, U.S. Naval Forces Philippines; and Representative of The Commander In Chief U.S. Pacific Command in the Philippines. The commander "of a naval station or larger shore activity of the Navy beyond the United States," has statutory authority to convene general courts-martial. Article 22(a)(6), UCMJ; 10 U.S.C. 822(a)(6). *See also United States v. Lahman,* 12 M.J. 513, 516 (N.M.C.M.R.1981) (finding there was no question as to the authority of the Commander, U.S. Naval Forces Philippines, to convene a general court). With passage of the "Goldwater-Nich-

olas [Nichols] [Department of] Defense Reorganization Act of 1986," Pub.L. 99-433 [H.R. 3622], October 1, 1986, Article 22 was amended to include "the commanding officer of a unified or specified combatant command." Article 22(a)(3), UCMJ; 10 U.S.C. 822(a)(3). *See* U.S. Code, Vol. 3 at 219-220 (1988 Ed.). The Pacific Command is a unified command of which CINCPACREPPHIL is a subordinate part.

**3.** *See,* AFR 111-1, *Military Justice Guide,* paras. 4-7b(3), 6-3c (30 September 1988) regarding delegation of authority for receiving and referral of court-martial charges.

Air Base (base where Staff Sergeant Hilton was assigned and tried) merchandise control regulation was signed by the Chief, Base Administration, although the commander's signature block is present. Clark AB Regulation 30–3 (hereinafter referred to as CABR 30–3), *Merchandise Control* (24 January 1986). Navy appellate counsel also note that SECNAVINST 5216.5C, paragraph 17b provides that there are a few senior staff members *in major commands* who are authorized to sign over their own titles. The Commander, U.S. Facility Subic Bay has been considered a major command for purposes of authority to promulgate general orders. *United States v. Chunn*, 15 U.S.C.M.A. 550, 36 C.M.R. 48 (1965). Therefore, it is argued, that as the senior staff officer of the command, the Chief of Staff should be recognized by us as having the authority to sign the regulation in question over his own signature. Navy appellate defense counsel counter by urging that USCINCPACREPPHILINST 4066.7Q is a directive that establishes policy, and therefore, according to Navy regulations must be "personally signed" by the commander. SECNAVINST 5216.5C, para. 17a. Considering the language in the instruction[4] this is a persuasive argument.

## B

We find these directives instructive but, as Navy appellate defense counsel acknowledge, they are not necessarily binding upon us in deciding this issue.[5] However, they do support the proposition that subordinates in many cases may act on behalf of their commander if authorized by him/her to do so. Additionally, as a general rule, staff members, when acting on behalf of the commander, acknowledge that fact by using a command line, such as "For the Commander" or "By Direction," when signing documents. Counsel have not brought to our attention, nor has our research revealed, any unified command directive in the Pacific theater of operations that bears directly upon this issue. This issue was not raised at trial, and we find nothing in the record nor any matter cited by counsel that would tend to indicate the Chief of Staff was acting beyond authority delegated to him by the commander when he signed the Instruction in question, other than that there is no command line above his signature. In all other respects the document appears regular on its face, and it was issued on paper bearing the command's letterhead. We note that other directives dealing with the control of tax-exempt property during the time frame A.L. Shapero served as Chief of Staff were signed by him in the same manner as USCINCPACREPPHILINST 4066.7Q. *See, e.g.*, USCINCPACREPPHILINST 5840.2B, *Tax Exemption Certificates and Procedures for Official Procurements, Importations and Other Transactions* (13 March 1985).

**4.** Paragraph 17a provides in part: "a. *What the Commanding Officer Must Sign.* The commanding officer, officer in charge, or person 'acting' in either position must personally sign documents that—(1) Establish policy.... (3) Deal with certain aspects of military justice." ["Certain aspects" is not further defined.]

**5.** We note that a Panel of this Court some three years ago, in an unpublished opinion, resolved this very issue in the following manner:

For the first time the accused now also claims that the instruction is not a lawful general regulation '... in that it was not signed by a general officer in accordance with applicable Navy regulations.' The directive was signed by the 'Chief of Staff' rather than by COMUSNAVPHIL personally. Attaching extracts from SECNAV Instructions and a COMUSNAVPHIL instruction, counsel argues that SECNAV Instructions require that the directive be signed by the commander himself, COMUSNAVPHIL. However, the directive involved here is not a Navy regulation. It is a unified command directive issued under the authority of USCINCPACREPPHIL, a subordinate commander of U.S. Pacific Command. The fact USCINCPACREPPHIL happens to be a Navy officer, and in another capacity is COMUSNAVPHIL, does not change this line of authority. Absent a showing to the contrary, service regulations, such as SECNAV Instructions would not govern the issuance of a unified command directive, such as this USCINCPACREPPHIL Instruction. Accordingly, we find, despite counsel's argument, that this instruction does not appear to be irregularly issued, there is no substantiated reason to question it's [sic] authority, and it is therefore valid.

*United States v. Willis*, ACM S27047, Slip.Op. at 2 (31 July 1986).

▊ We agree with Air Force appellate government counsel that the long standing presumption, that there is regularity in the conduct of governmental affairs, should not be disregarded in this case.

> Courts have long indulged in the legal presumption of regularity in the conduct of governmental affairs. *United States v. Pugh*, 99 U.S. 265, 271, 25 L ed 322, 324, —— S Ct ——; *Johnson v. United States*, 225 U.S. 405, 411, 56 L ed 1142, 1144, 32 S Ct 748 [750]. [Cites as they appear in original text.] In the absence of a showing to the contrary, this court must presume that the ... [military department] and its officials carry out their administrative affairs in accordance with regulations....

*United States v. Masusock*, 1 U.S.C.M.A. 32, 1 C.M.R. 32, 35 (1951). Subsequently, it was held that, notwithstanding service regulations requiring subordinates to sign certain documents "By direction" of the commander, said documents were properly received in evidence even though the signature element did not reflect that the subordinate was signing by direction of the commander. In the absence of any evidence to the contrary, the delegation of authority to sign may be presumed. *United States v. Moore*, 8 U.S.C.M.A. 116, 23 C.M.R. 340 (1957). *See also United States v. Johnson*, 10 U.S.C.M.A. 630, 28 C.M.R. 196 (1959); *United States v. Trani*, 3 U.S.C.M.A. 27, 3 C.M.R. 27 (1952); *United States v. Hodge*, 26 M.J. 596, 599 (A.C.M.R.1988), *pet. granted on other grounds*, 27 M.J. 452 (C.M.A. 1988); *United States v. Pulliam*, 14 M.J.

617 (A.F.C.M.R.1982); *United States v. LeMarbe*, 11 M.J. 864 (N.M.C.M.R.1981); *United States v. Young*, 49 C.M.R. 133, 136 (A.F.C.M.R.1974); Winthrop, *Military Law and Precedents*, 575–576 (2d Ed. 1920).[6]

Or, to put it another way, as did our predecessor Board of Review, it is "presumed that public officials (and military officers are such officials ...) purporting to act under the color of their office, do not act without authority." *United States v. Whitaker*, 5 C.M.R. 539, 547 (A.F.B.R. 1952). Since we have no evidence that the Chief of Staff usurped command authority, we find no legal basis to question the validity of USCINCPACREPPHIL INST 4066.-7Q.

## II

### A

As noted earlier, the appellant was tried and, contrary to his pleas, found guilty of violating USCINCPACREPPHILINST 4066.7Q (hereinafter referred to as INST 4066.7Q), dated 16 August 1984, more specifically paragraph 3h of Enclosure (6) thereof, by failing to show possession or authorized disposition of a tax-exempt motor vehicle. The Instruction is entitled *General Merchandise Control Regulations in the Republic of the Philippines.* Enclosure (6) deals with "Prohibited Acts and Practices." The specific part of the Instruction allegedly violated states:

> 3. *Tax–Exempt Motor Vehicles.* The following acts and practices relating to

---

**6.** Our research also revealed a recent unpublished decision by the Navy–Marine Corps Court of Military Review which we find analogous to this issue. *United States v. Jones*, NMCM 88 2419 (N.M.C.M.R. 24 March 1989). In *Jones* the Court faced an issue as to whether the statute of limitations had been tolled by the receipt of sworn charges. In the "FOR THE" block of the charge sheet, the words "Command Judge Advocate" had been typed in. In the signature block was a signature purporting to be that of the command judge advocate. The Court took judicial notice that, unless there is evidence in the record to the contrary (there was none in that case), command judge advocates are not officers exercising summary court-martial authority. *See* Article 24, UCMJ, 10 U.S.C. § 824.

Based upon this irregularity on the face of the document, the Court found that the presumption of regularity had been rebutted, citing *United States v. Centeno*, 17 M.J. 642 (N.M.C.M.R. 1983), *pet. denied*, 17 M.J. 429 (C.M.A.1984) and *United States v. Emerson*, 12 M.J. 512 (N.M.C.M.R.1981), *pet. denied*, 13 M.J. 43 (C.M.A.1982). However, the Court held:

> in the absence of evidence to the contrary, we presume that, as a command judge advocate and a lieutenant commander in the JAG Corps, attached to a major at sea command, Lieutenant Commander Curreri understood his ministerial duties and performed them consistent with the law, including pursuant to a proper delegation of authority.

*Citing United States v. Johnson*, 28 C.M.R. 196.

the acquisition, possession, and disposition of motor vehicle [sic] are *prohibited:*

\* \* \* \* \* \*

h. Failure to show possession or authorized disposition of tax-exempt motor vehicles when so directed by cognizant authorities.

There is a similar provision regarding other types of tax-exempt personal property. The directive defines tax-exempt property as "personal property or motor vehicles in the RP ... upon which no RP import, excise, consumption, or other tax, duty, or import has been paid by reason of the exemption granted pursuant to reference (a)." (Reference (a) is the military bases agreement.) *Id.* at para. 1, Encl (6). It applies to everyone associated with the U.S. forces within the RP who is entitled to tax-free privileges, including civilians, dependents and retired military personnel. Part of the preamble to the directive provides that "the information requested herein is solicited under the authority of PL 78–380, 58 Stat 626, as implemented by the agreement between the United States of America and the Republic of the Philippines concerning military bases, 14 March 1947, as amended." [7] The cited public law authorizes the President of the United States through negotiation with the Philippine government to acquire and retain "defense bases" within the RP for the mutual protection of both countries.

Article V of the 1947 military bases agreement states:

Exemption From Customs and Other Duties

No import, excise, consumption or other tax, duty or impost shall be charged on material, equipment, supplies or goods, including food stores and clothing, *for exclusive use* in the construction, maintenance, operation or food stores and clothing, *for exclusive use* in the construction, maintenance, operation or defense of the bases, consigned to, or destined for, the United States authorities and *certified by them to be for such purposes.*

(Emphasis added.)

Article XVIII covers sales and services within the bases. Part of it provides:

1. It is mutually agreed that the United States shall have the right to establish on bases, free of all licenses; fees; sales, excise or other taxes, or imports; Government agencies, including concessions, such as sales commissaries and post exchanges, messes and social clubs, for the exclusive use of the United States military forces and authorized civilian personnel and their families. The merchandise or services sold or dispensed by such agencies shall be free of all taxes, duties and inspection by the Philippine authorities. *Administrative measures shall be taken by the appropriate authorities of the United States to prevent the resale of goods which are sold under the provisions of this Article to persons not entitled to buy goods at such agencies and, generally, to prevent abuse of the privileges granted under this Article.* There shall be cooperation between such authorities and the Philippines to this end.

(Emphasis added).

Thus, this bilateral agreement between the two countries obligates the United States to adopt procedures to insure that the tax-exempt status granted to the U.S. forces is not abused. INST 4066.7Q was promulgated for that purpose.[8] Effective 1 Janu-

---

7. 61 Stat. 4019; TIAS 1775; 43 UNTS 271. This and other treaties and status of forces agreements entered into by the United States and foreign governments are compiled in Air Force Pamphlet 110–20, *Selected International Agreements* (27 July 1981).

8. Addressing a similar regulation applying to the U.S. forces in the Republic of Korea, the Army Court of Military Review has found:

[T]he United States Army sends military forces into the sovereign nation of the Republic of Korea for mutually beneficial reasons of national security; ... the import and export of goods to and from the Republic of Korea by members of the United States Armed Forces are matters of political concern between the Republic of Korea and the United States of America; the SOFA [Agreement on the Status of U.S. Armed Forces in Korea] contains vital agreements concerning sensitive customs matters and identifies certain related rights and obligations attending members of our Armed Forces who are stationed

ary 1978, the Philippine Government banned all sales of tax-exempt property to nontax-exempt persons. *See* INST 4066.Q, para. 3.

## B

The securing and retention of duty and tax-free privileges for members of the U.S. forces is a very important benefit. In fact, many servicemembers and their families could face serious financial hardships if they were required to serve overseas without this benefit. *See United States v. Lee*, 25 M.J. 457, 468 (C.M.A.1988) (Judge Cox concurring in part and dissenting in part). For example, in the present case, the vehicle Staff Sergeant Hilton had imported, and which he was charged with being unable to account for, was a 1986 Mitsubishi Galant Super S Sedan valued at $7,599.00. Information in the allied papers indicates that import duties and taxes would have been 100% of the vehicle's value; on the other hand, quite a savings if a nontax-exempt individual could get their hands on such a vehicle. The directives issued in an effort to protect this benefit and insure non-abuse in actuality establish a records keeping system. Following is a summary of the regulatory provisions pertinent to the case now before us.

There are Merchandise Control Officers (MCO) at each U.S. installation in the RP. For items of property subject to special control (usually referred to as "controlled items," which includes privately owned motor vehicles), an auditable record of patron acquisitions and dispositions by sale or other means must be established to account for this property. INST 4066.7Q, para. 9a. Copies of all documents reflecting a patron's purchases of controlled items from a retail outlet (exchanges and their concessionaires) must be sent to the MCO responsible for maintaining that person's merchandise control record. *Id.* at para. 13b(5). Controlled items acquired through the U.S. postal system or from any other

source outside the RP must be reported to the appropriate MCO within five days of receipt. *Id.* at Encl (2), para. 1b. When a servicemember is assigned to the RP, motor vehicles and any other controlled items imported in household goods shipments must be reported. USCINCPACREPPHI-LINST 5840.2B, at para 5e(2) and Encl (2). A "Tax Exemption Certificate" listing these items must also be prepared and furnished to the Philippine Ministry of Finance. *Id.* at para. 5d and Encl (1). Further, an accounting for controlled items imported or purchased during a tour of duty "will be made to the cognizant Merchandise Control Activity prior to the individual's detachment or departure from the RP...." INST 4066.7Q at Encl (1), para. 5. Appropriate command authorities are tasked to "[t]ake continuing action to disseminate the provisions of this instruction to all personnel reporting for duty in the RP so that personnel will be informed at the earliest feasible date of merchandise control limitations which will affect them during their tours." *Id.* at para. 13b(4). Finally, subordinate commanders are authorized to issue implementing/additional instructions concerning merchandise control.

■ At Clark Air Base, CABR 30–3, *Merchandise Control* (24 January 1986) was the implementing directive in force at the time of commission of the offense charged in this case. We take judicial notice of this regulation. Pertinent provisions of the regulation are set forth in the Appendix to this opinion.

## C

■ Having reviewed the regulatory scheme existing in the RP, we now address the matter presented on remand. We conclude that an order to account for tax-exempt property under the regulatory program governing merchandise control in the RP is lawful, and is not a *per se* violation

---

in the Republic of Korea; and, USFK Reg. 27–5 is designed, in part, to prohibit conduct by members of our forces which would violate the spirit and scope of the SOFA, particularly with respect to customs control.

*United States v. Battle*, 20 M.J. 827, 828 (A.C.M. R.1985), *pet. denied*, 21 M.J. 317 (C.M.A.1985). Those observations are equally applicable to our forces stationed in the Republic of the Philippines.

of a servicemember's rights under the Fifth Amendment and Article 31, UCMJ. In most respects, we believe the rationale developed by Judge Gilley in the *Williams* case presents a correct legal resolution of this issue. *United States v. Williams*, 27 M.J. 710, 726–729 (A.C.M.R.1988) (Judge Gilley concurring in part and dissenting in part).[9] We also bear in mind the principle that it is the duty of courts to construe a statute in order to save it from constitutional infirmities if possible. *See, e.g. Webster v. Reproductive Health Services*, —— U.S. ——, 109 S.Ct. 3040, 3053, 106 L.Ed.2d 410 (1989); *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). The same can be said for military orders and regulations. *Unger v. Ziemniak*, 27 M.J. 349 (C.M.A.1989); *United States v. Masusock*, 1 U.S.C.M.A. 32, 1 C.M.R. 32 (1951). In deciding this issue, we have considered the entire regulatory scheme, including the Clark AB regulation.

The United States Supreme Court has formulated a "required records" doctrine under which an individual must produce documents for review by governmental authorities. The Fifth Amendment's privilege against self-incrimination cannot be asserted to bar production. As stated by the Court in *Wilson v. United States*, 221 U.S. 361, 380 and 382, 31 S.Ct. 538, 544 and 545, 55 L.Ed. 771 (1911):

> The principle applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established. There the privilege which exists as to private papers cannot be maintained....
>
> [W]here, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to incriminate him. In assuming their custody he has accepted the incident obligation to permit inspection.

The doctrine applies even though the object of the inquiry is to discover violations of the law and base criminal prosecutions thereon. 221 U.S. at 382, 31 S.Ct. at 545.[10] *See also Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

This doctrine was further refined in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) and *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).[11] Two years after

---

9. As far as establishing a valid basis for the regulatory requirement in question (accountability), we also concur with the analysis in Part IIB of the majority opinion by the Army Court in *Williams*. *United States v. Williams*, 27 M.J. at 717–718.

10. *Wilson* involved documents generated by a private corporation that were sought by a grand jury investigating mail fraud.

11. Shapiro, a wholesaler of fruit and produce, was obligated by regulations issued under authority of an emergency price control act to keep and preserve for examination various sales records. In response to an administrative subpoena to produce said records he claimed the constitutional privilege. The Court held the privilege could not be invoked, reasoning:

> It may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself. But no serious misgiving that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator.

*Shapiro v. United States*, 335 U.S. at 32, 68 S.Ct. at 1391.

Marchetti was charged with failing to pay an occupational tax related to certain gambling activities and failing to register before engaging in the business of accepting wagers. He claimed the privilege. The Court discussed the "required records" doctrine in some detail, but held that it did not apply in this case because the statutory requirements sought information unrelated to any records about gambling activities that those so involved might keep (not significantly different from a demand for oral testimony) and

*Marchetti,* the Court again faced the privilege challenge in a case involving California's "hit and run" statute (drivers involved in an accident must stop and report their names and addresses). *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). Although dealing with a reporting rather than records keeping requirement, we believe the Court's rationale is applicable to the issue being addressed herein:

> An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion. (Footnote omitted.)

> In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be a 'link in the chain' of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.

*Id.* at 427–428, 91 S.Ct. at 1537–1538.[12]

Based on the foregoing precedent, Judge Gilley succinctly summarized the basis for application of the "required records" doctrine in the *Williams* case:

> Generally, the Supreme Court has formulated a three-part requirement: first, the regulatory provisions require the keeping and preserving of records; second, the records have 'public' aspects because they are reasonably related to an authorized governmental function; and third, the requirement is not directed toward a 'selective group inherently suspect of criminal activities.'

*United States v. Williams,* 27 M.J. at 727, citing *Marchetti v. United States,* 390 U.S. at 57, 88 S.Ct. at 707.[13] The Supreme Court has not applied the doctrine when the components of this requirement are not

---

were aimed at a particular group suspected of criminal activities.

**12.** In the military context, Judge Cox hit the nail on the head when he stated:

[T]he duty to account here is not fundamentally distinct from numerous other such duties incumbent on servicemembers, such as the duty of commanders or property-book officers to account for their assets; the duty of supervisors to account for the whereabouts and activities of their subordinates; the duty of club managers to account for revenues and expenses; the duty of individual servicemembers to account for their issued military gear. *United States v. Lee,* 25 M.J. at 470. *Cf. United States v. Bair,* 29 M.J. 862 (A.F.C.M.R.1989) (and cases cited therein dealing with compulsory drug urinalysis testing). Conceptually, it is hard to distinguish between requiring a servicemember to account for a piece of high-value property in a foreign country where the United States has negotiated a very favorable tax status, and requiring the same member to produce a urine specimen by command direction or random screening—the failure to do either being prosecutable as failing to obey an order. *See Murray v. Haldeman,* 16 M.J. 74 (C.M.A.1983).

**13.** For more recent cases applying or analyzing this doctrine *see, e.g., California Bankers Assn. v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (customer records maintained by banks); *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331 (4th Cir.1983) (permits and records relating to operation of a hazardous waste facility); *In re Doe,* 711 F.2d 1187 (2d Cir.1983) (psychiatrist's W–2 forms, prescription forms and patient files); *In re Grand Jury Proceedings,* 601 F.2d 162 (5th Cir.1979) (broker's records and accountant's analysis thereof—conviction for criminal contempt reversed); *United States v. Scherer,* 523 F.2d 371 (7th Cir.1975) (firearms registration and recording requirements); *In re Grand Jury Subpoena to Custodian of Records, Etc.,* 497 F.2d 218 (6th Cir.1974) (escrow records of real estate broker); *United States v. Resnick,* 488 F.2d 1165 (5th Cir.1974) (firearms transaction records); *United States v. Lebman,* 464 F.2d 68 (5th Cir.1972) (firearms transaction records); *United States v. Kaufman,* 429 F.2d 240 (2d Cir.1970) (securities exchange records); *Petition of Federal Deposit Ins. Corp.,* 640 F.Supp. 1178 (S.D.N.Y.1986) (bank records).

present. *See, e.g., United States v. United States Coin & Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) (forfeiture of gambling proceeds—aimed at particular group suspected of criminal activities); *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (transporting marijuana without payment of transfer tax—aimed at particular group suspected of criminal activities); *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (failure to register and possession of unregistered firearms—aimed at a particular group suspected of criminal activities); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (failure to pay excise and occupational taxes on wagering activities—aimed at particular group suspected of criminal activities); *Marchetti v. United States, supra* (failure to pay occupational tax and failure to register regarding wagering activities—aimed at particular group suspected of criminal activities); *Albertson, et al. v. Subersive Activities Control Board,* 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965) (failure to register as Communist Party members—not an essentially non-criminal and regulatory area of inquiry, but aimed at particular group suspected of criminal activity since the Communist Party itself was outlawed at that time).

### D

We now apply these precedents to the regulatory scheme in question. We first note that we are not playing with a hidden ball when it comes to the application of the merchandise control program in the RP. Its provisions, including accountability for controlled items, are widely publicized.

*See* INST 4066.Q7 at para. 13b(4); CABR 30–3 at para. 1–2b.[14] *See also* MCM, Part IV, para. 16c(1)(d).

Clearly, the merchandise control program existing in the RP requires the keeping and preserving of records.[15] This is especially true with regard to controlled items, for which an auditable record of all importations, acquisitions and dispositions is required. *See* above discussion of provisions of INST 4066.7Q and the Appendix to this opinion. Merchandise Control Officers must "[r]ecord, control, and cause to be investigated, when appropriate, all transactions and tax-free possessions of personnel under the cognizance of the Merchandise Control Activity." INST 4066.7Q, para. 9c.

The records required to be kept are reasonably related to an authorized governmental function—the carrying out of American foreign policy. Congress authorized the President to acquire and maintain "defense bases" within the RP. Pursuant to that authority, the two countries negotiated a military bases agreement. The RP extended tax and duty-free import privileges to the United States and its servicemembers, in exchange for which the United States promised to adopt measures to insure those privileges were not abused. Thus, there is a legitimate basis for governmental regulation. *United States v. Battle, supra; United States v. Lindsay,* 11 M.J. 550 (A.C.M.R.1981), *pet. denied,* 11 M.J. 361 (C.M.A.1981). Further, it could hardly be said that these records do not have "public" characteristics, for the regulatory scheme adopted provides that it is the government that is supposed to maintain the files that account for this property. Individual files are maintained on assigned

---

**14.** Throughout the Air Force, base Family Services offices maintain orientation folders on other Air Force bases. *See* AFR 30–7, *Family Action/Information Board (FAIB) and Family Support Center (FSC),* para. 2–2c(4) (9 January 1984); AFR 211–24, *Family Services Program,* paras. 2–2c(1)(f) and 3–5d (1 October 1988). They contain information similar to that which a sponsor would send in-coming personnel before they started their permanent change of station move. We examined the file for Clark AB maintained at the Bolling AFB Family Services office. Interestingly enough, it contained a copy of the 1986 Clark Air Base Guide, which

included an entire section on merchandise control procedures. There was also a one page Fact Sheet about the program.

**15.** The majority opinion by the Army Court in *Williams* did discuss the required records doctrine. However, it concluded that the doctrine did not apply since there was no requirement that records be kept under the merchandise control directive in effect in Korea. *United States v. Williams,* 27 M.J. at 721–722. *Contra United States v. Williams,* 29 M.J. 112, 115 (C.M.A.1989).

U.S. forces members, just as are an individual's personnel or medical records. It is the member's responsibility to insure the files are accurate. *See* CABR 30–3, para. 1–5 (Appendix).

Finally, the regulatory requirement for keeping these records is not directed at a "selective group inherently suspect of criminal activities." *Cf. United States v. Lavine,* 13 M.J. 150 (C.M.A.1982). It applies to the entire American defense community in the RP, the vast majority of whom faithfully comply with the merchandise control program.[16]

We therefore conclude that the regulatory scheme established in the RP to control the acquisition and disposition of duty and tax-free controlled property (including motor vehicles) conforms with the precepts underlying the "required records" doctrine.[17] Requiring a servicemember to account for such property does not constitute a *per se* violation of an individual's right against self-incrimination as set forth in the Fifth Amendment. Upon request by proper authority, we believe a servicemember can be required to either present valid documentation showing authorized disposition of items of controlled property (*see* CABR 30–3, para. 1–6 (Appendix)), or display the property itself together with an importation document (USCINCPACREP-PHILINST 5840.2B) or purchase document (CABR 30–3, para. 3–3) thereby establishing present authorized possession thereof. If unable to do so, the member may be held criminally responsibility for violating the accountability provisions of the merchandise control program. The privilege incorporated in the Fifth Amendment and Article 31(a), UCMJ, cannot be asserted in bar thereof.[18] The applicability of Article 31(b) is another matter, and will be discussed in Part IIE below.

We make two other observations. The regulatory scheme here under review, as formulated, does not necessarily require an "oral" statement or the functional equivalent thereof (for example, production of "private" records). *See Wilson v. United States, supra; Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). As noted above, if a member cannot produce valid documentation or the property itself, in our view the regulation has been violated. Nor is there any requirement that members of the U.S. forces, once on notice of the provisions of the merchandise control program, subject themselves to its regimens. One could simply decide not to request tax-exempt status while serving in the RP, and instead choose to live on the local economy. Of course, as noted earlier, the economic impact of such a decision could be devastating. As the old adage states: If you want to play the game, you have to comply with its rules.

### E

Due to unique factors present in the military environment (i.e., the special relationship between superior and subordinate persons), the United States Court of Military Appeals has interpreted Article 31(b),

---

**16.** Data maintained in the Air Force's military justice reporting system (*See* Air Force Manual 111–651, *Automated Military Justice Analysis and Management System* (19 December 1980)) reveal that during the three year period from 1986 to 1988 only 11.8% (39 in number) of all specifications referred to trial by court-martial at Clark AB involved black marketing activities. Of the 1,985 Article 15, 10 U.S.C. § 815 U.S.C. (nonjudicial) punishments administered during that period, only 11 involved such activities.

**17.** An excellent analysis of this approach as a resolution to the quandary created by *Lee* appears in a recent article by Captain Anne E. Ehrsam. *See* DA Pam 27–50–197, *The Army Lawyer,* "First *Lee,* Now *Williams:* Has The Shield of the Privilege Against Self–Incrimination Become a Sword?," 30–37 (May 1989).

**18.** Article 31(a) provides: "No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." The Fifth Amendment provides in pertinent part: "No person ... shall be compelled in any criminal case to be a witness against himself...." It has been a longstanding principle of military law that these two provisions are coterminous. *United States v. Eggers,* 3 U.S.C. M.A. 191, 3 C.M.R. 191, 195 (1953). *Accord United States v. Ravenel,* 26 M.J. 344 (C.M.A. 1988); *United States v. Harden,* 18 M.J. 81 (C.M.A.1984); *United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980).

UCMJ, to be broader in scope than the Fifth Amendment and the warning required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *United States v. Lewis,* 12 M.J. 205 (C.M. A.1982); *United States v. Duga,* 10 M.J. 206 (C.M.A.1981); *United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980).[19] Article 31(b) provides:

> No person subject to this chapter may interrogate, or request any statement from an accused or *a person suspected of an offense* without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

(Emphasis added.)[20] Applying the statute and caselaw interpreting it, as well as the precedents discussed earlier, to the issue we face, we conclude the following rules should apply: (1) Any U.S. forces member with duty and tax-free privileges may be required upon proper request to account for controlled items of property, specifically identified as such by regulation, at any time;[21] (2) Whether or not suspected of an offense relating to said property, the member may be required to produce valid records showing acquisition or disposition, or produce the property itself—a service member who cannot or refuses to do so is subject to criminal liability under the accountability provisions of the regulation (i.e., often referred to as the "show and tell" clauses); and, (3) If suspected of an offense, the requirements of Article 31(b) and (d) apply, and any unwarned "state-

ments," oral or otherwise, not specifically related to producing the required records or the property itself, would constitute a statement obtained in violation of the Article which could be asserted in bar to the admission in evidence of any such statements at any subsequent judicial or nonjudicial proceeding under the Uniform Code related thereto.[22]

The foregoing assessment of this matter is provided in response to the mandate we received. It indicates how we would resolve this difficult and troublesome legal issue were we the final arbiters thereof. Of course, we are not. It is an expression of where we believe the law should stand, not necessarily where we believe it does stand today. Our present responsibility and duty, however, is to apply the law as we believe it presently stands to the facts of the case now before us.

### III

### A

Following the Court of Military Appeals decision in *United States v. Lee,* 25 M.J. 457 (C.M.A.1988), several cases were remanded to the service Courts of Review to address the constitutional issue regarding the accountability provisions in the merchandise control regulations in Korea and the RP, this case being one of them. Judge Sullivan, writing the lead opinion in *Lee,* concluded that since Lee was a suspect at the time the "show and tell" inquiry was conducted, "Article 31 precludes this regulation or orders purportedly based thereon from being used to compel him to incriminate himself." *Id.* at 460. There was no Article 31 rights advisement, there-

---

**19.** Chief Judge Everett addressed this distinction most recently in *United States v. Ravenel,* 26 M.J. 344 (C.M.A.1988).

**20.** This distinction also applies to Article 31(d) which states: "No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."

**21.** We make no judgement as to whether or not our reasoning and conclusions would apply to property not subject to special control.

**22.** Thus, upon proper motion any unwarned statements by a suspect could be suppressed if offered into evidence in support of any other offenses charged; for example, an allegation that the accused transferred duty free goods to a non-tax exempt person in violation of INST 4066.7Q, Encl (6), paras. 2a or 3d. *See United States v. Williams,* 29 M.J. at 115; *United States v. Lee,* 25 M.J. at 459.

fore, the regulatory program as applied to Lee was unconstitutional. Thus, Judge Sullivan did not find it necessary to address the broader question as to whether the accountability provision of the regulation applicable in that case was unconstitutional *per se*. Chief Judge Everett in a concurring opinion did address the broader question, and concluded that the accountability requirement itself was constitutionally flawed. The regulation was, therefore, unlawful and "cannot be made the basis for trial by court-martial under Article 92 of the Uniform Code." *Id.* at 465. Judge Cox also wrote separately, concurring in part and dissenting in part. He agreed with Judge Sullivan that since Lee was a suspect at the time of the unwarned questioning, the statements he made should have been suppressed, requiring reversal of his conviction for purchasing controlled items in excess of authorized limits. On the other hand, Judge Cox believed the accountability provision of the regulation was lawful and could be applied against Lee. Thus, his conviction for failing to account should have been upheld.

The Army Court's decision in *Williams* actually addressed two cases, *United States v. Williams* and *United States v. Koh*, both remanded following publication of *Lee*. Williams was charged with failing to account for controlled items, among other offenses. He pleaded guilty at trial. It was stipulated that he was requested by his company commander to show proper disposition of several pieces of electronic equipment, but could not do so. The constitutionality of the regulatory disclosure

requirement was not litigated at trial. The majority of the Army Court held that the government could properly regulate acquisition and disposition of tax-exempt property, but that the Fifth Amendment was "an *exception* to the essential power of the sovereign to compel disclosures." *United States v. Williams*, 27 M.J. at 716. Thus, if asked to account for property, a servicemember could assert the Fifth Amendment/Article 31 privilege. Because the regulation itself threatens criminal prosecution for failure to account, the Court found that "failure to invoke the privilege at the time that disclosure was requested does not constitute waiver of the privilege." *Id.* at 718. However, failure to assert it at trial does waive the privilege. *Id.* at 719. Likewise, the privilege cannot be invoked for the first time on appeal. *Id.* Therefore, the Court affirmed Williams' conviction.[23]

In September 1989, the Court of Military Appeals affirmed the Army Court's decision in *Williams*. *United States v. Williams*, 29 M.J. 112 (C.M.A.1989).[24] The Court held that by applying a narrow construction to the regulatory disclosure provision, the provision was "not unconstitutional *per se* and does not compel disclosures in violation of the Fifth Amendment or Article 31." *Id.* at 113. The Court reasoned:

The operative language of this regulation requires a servicemember, upon request, to 'present valid and bona fide information or documentation showing the continued possession or lawful disposition ... of' specified items. A limited

---

**23.** In *United States v. Koh*, the accused, pursuant to the terms of a pretrial agreement, pleaded guilty to all offenses charged, including a specification of failing to account for proper disposition of numerous controlled items of property. Koh was ordered by a military police investigator to disclose disposition of the property. He told the investigator that he had given some $5,000.00 worth of controlled goods to various Korean national relatives, none of whom could lawfully receive such property. His statement to the investigator was admitted at trial without objection. However, prior to entering pleas, Koh did challenge the constitutionality of the regulation's accounting requirement. The Army Court held that Koh had effectively raised the "substantive defense" afforded by the Fifth

Amendment privilege against self-incrimination; that he had done so in a timely manner; and, that his subsequent guilty plea did not waive the defense afforded by the privilege, citing *Haynes v. United States, supra.* Since the military judge did not obtain from the accused an affirmative withdrawal of the constitutional defense, the plea to the failure to account offense was improvident. The Court set aside the findings of guilty of that offense and reassessed the sentence. *United States v. Williams*, 27 M.J. at 719–726.

**24.** Judge Sullivan again issued the principal opinion of the Court, with which Judge Cox concurred.

construction of this language suggests that the servicemember must show physical possession of the item or must possess some type of documentation or other papers showing lawful disposition if the item is no longer in his possession.... Different questions or additional questions in combination with the original request to produce the item or documentation are not authorized. This construction of the regulation would avoid one major problem raised in *United States v. Lee, supra,* namely, the scope of inquiry permitted by the regulation. [Footnote]

*Id.* at 115. In the footnote (Note 2) it was pointed out that the order to disclose in the *Lee* case, that the accused "show Lieutenant Krause the presence or whereabouts of these items," clearly extended beyond the production of documents. *Id.* Earlier in the opinion of the Court, its holding in *Lee* was set forth: "that the particular application of the ... disclosure provision ... to an unwarned suspect violated the Fifth Amendment and Article 31." *Id.* at 114. The Court concluded its opinion in *Williams* by cautioning: "Here, the evidence of record does not show that appellant was a suspect at the time of questioning or that he was asked questions which violated the Fifth Amendment or Article 31." *Id.* at 117.[25]

### B

All that remains is to apply the law as we understand it to the facts in this case. The facts were summarized in our opinion at 26 M.J. 635 and will not be reiterated here except as necessary for our present decision. One statement we made in that summation needs clarification. We stated: "Law enforcement authorities suspected that the appellant had been fraudulently paid to obtain a Tax Exempt Certificate [TEC, for purchase of an motor vehicle]. Accordingly, on 7 March 1986, he was interviewed by agents of the Office of Spe-

cial Investigations (OSI) and asked to produce the vehicle." 26 M.J. at 636.[26] Based upon our further review of the record, we refine that statement. Whether the appellant *personally* was a suspect at the time is not clear from the record.

A copy of the OSI Report of Investigation was included in the allied papers. It indicates the investigation was initiated "based on SUBJECT'S inability to show proper disposition of a tax exempt vehicle." The first part of the report includes the following information. Investigative activity had revealed that local car dealers were paying military members, whom they recruited, to sign the necessary documents to purchase and import tax-exempt vehicles. The military member would then obtain a TEC and give it to the car dealer. The military member would never see the vehicle when it arrived. As part of their investigation, OSI obtained from Philippine customs officials copies of a TEC and a POV Certification Statement pertaining to the appellant's purchase of a certain vehicle. The TEC indicated the vehicle had arrived in Manila, RP, on 30 January 1986. On 7 March 1986 the appellant was interviewed and asked to show the vehicle in question. He said he did not have the vehicle. He was then advised of his rights under the provisions of Article 31, UCMJ.

■ Special Agent (SA) McPartlin, the principle agent conducting the investigation, testified at trial, in pertinent part as follows:

Basically what we investigated was military members that were being used by local nationals to import vehicles into the Philippines using their tax exempt status. The members in this case within our investigations, there was [sic] a lot of individuals that were paid for their services.

\*      \*      \*      \*      \*      \*

We conducted show and tells on individuals who had been issued tax exemption

25. The Court made no comment with regard to the Army Court's disposition of the case by invoking the waiver doctrine.

26. One basis of the Court of Military Appeals' decision to remand this case for a second time was "the finding of fact by the Court of Military Review that appellant was a suspect." 27 M.J. at 326.

certificates for the year of 1985. Basically what that entailed is, we had the TEC saying a particular vehicle was brought in the country, we called the individual up and asked them to see the vehicle or show proper disposition.

\* \* \* \* \* \*

Sergeant Hilton came into the office, we asked him to produce the vehicle or show proper disposition at which time he told us he did not have possession of the vehicle.

Q: What did you do at that point?

A: We advised him of his rights under Article 31.

There is no other evidence of record bearing directly on this matter. This is not surprising, since this was not a subject at issue at trial. From what is available, we conclude that the OSI had a general suspicion that servicemembers were involved in a scheme with local car dealers to import vehicles into the RP for unlawful disposition. There is no evidence indicating that the investigating agents personally suspected the appellant at the time he was asked to account for a vehicle which documents indicated he had imported.

Thus, we believe the circumstances present in this case are sufficiently similar to those in *Williams* to permit the findings of guilty to be affirmed. As Judge Sullivan pointed out: "Production of the item or the documents specified by regulation showing the proper disposition of the same would seem to fit squarely within the required-records exception to the Fifth Amendment privilege." *United States v. Williams*, 29 M.J. at 116. Asking the appellant to account for the vehicle in accordance with the regulation appears to be all that the OSI agents did in this case prior to the rights advisement. The regulation can, therefore, be constitutionally applied to the appellant.

The approved findings of guilty and sentence are again

AFFIRMED.

Chief Judge HODGSON, Senior Judges FORAY and KASTL, Judges SPILLMAN, LEONARD, MURDOCK and PRATT concur.

## APPENDIX

In most respects Clark AB Regulation 30-3, *Merchandise Control* (24 January 1986) mirrors USCINCPACREPPHILINST 4066.-7Q. It is applicable to all U.S. forces personnel, including U.S. national contractor personnel, civilian employees and dependents. Violations of its provisions are subject to disciplinary action under Article 92(2), UCMJ, as it is not a general regulation. It is issued by a commander who exercises special court-martial authority. Some of its pertinent provisions are as follows:

1-2. RESPONSIBILITIES:

\* \* \* \* \* \*

b. Commanders. Each commander is responsible to make sure that all personnel are kept knowledgeable of the contents of this regulation. . . .

\* \* \* \* \* \*

e. All Patrons. As a part of the logging process, Merchandise Control monitors (MCMs) are required to thoroughly check all identification and privilege cards to make sure they are valid documents. Documents will be removed from wallets and/or wallet carriers and presented to the MCM for verification. Military personnel in uniform with purchases of $25.00 or less are excluded from having to remove cards from carriers.

1-3. MERCHANDISE CONTROL MONITORS (MCMs). MCMs are an important part of the Merchandise Control system. MCMs are assigned to exchange, commissary, and other outlets to check identification and privilege cards, log purchases, prepare purchase records, and perform other duties as directed by the Merchandise Control Officer [MCO].

\* \* \* \* \* \*

1-5. RECORD CHECKS. Personnel are encouraged to perform periodic checks of their merchandise control records so that any apparent error can be detected and corrected. Sponsors will make sure that all controlled items in their possession are

reflected in their records group. Individuals will make sure that refund and exchange documents are included in their records when returning controlled/high value items to Philippine Area Exchange (PHAX). Personnel departing for a permanent change of station (PCS) assignment will review their records not later than 30 days prior to DEROS to make sure records are accurate and all supporting documents for disposition of high value/controlled items are included. Those individuals failing to complete this required action may be delayed during their final out-processing for PCS. Personnel will make sure that all items identified during the records check are clearly identified, with complete information of their outbound shipping documents or make sure they have processed a CAB Form 56, Disposition of Controlled/Hi–Value Items, through the US Military Post Office. Persons unable to account for controlled/high value items as [sic] the time of out-processing will be referred to their commanders for appropriate action prior to clearance being given by the MCO.

    \*     \*     \*     \*     \*     \*

**1–6. OUT PROCESSING:**

a. PCS, Separation, or Retirement (Departure from the Philippines).

(1) Personnel will show proper disposition of all controlled and high value items prior to departing the Philippines by one of the following documents:

(a) Properly documented PHILGEN Form 5800/5A, Deed of Absolute Sale.

(b) Properly documented PHILGEN Form 5512/14, HHE—Personal Property Transfer.

(c) Shipping documents from the servicing Traffic Management Office (TMO), which list a description of the item, including brand name, type item, model and serial number.

(d) Properly documented PHILGEN Form 4066/9, Postal Disposition of Tax–Free Merchandise, or CAB Form 56.

(e) Properly documented DD Form 1348–1, DOD Single Line Item Release/Receipt Document (received from Defense Reutilization and Marketing Office ...).

(f) A signed sworn statement by the individual and countersigned requesting clearance for the individual by the unit commander, indicating that an investigation has determined that a loss or theft occurred as stated by the individual.

(g) CAB Form 9, MC Controlled/Hi–Value Destruction Certificate, maybe [sic] used only for controlled/high value items not specifically listed on the controlled/high value list in this regulation.

    \*     \*     \*     \*     \*     \*

(3) Failure to account for any controlled/high value item identified in MC records will result in possible administrative/disciplinary action by the member's commander prior to release for PCS, administrative hold sanctions, and possible delay in departure from the Philippines.

    \*     \*     \*     \*     \*     \*

**3–3. PURCHASE LIMITATIONS:**

a. .... Controlled item purchases will be documented by the initiation of a PHILGEN Form 10140/8, Controlled Item Purchase Record. [Sub-paragraph b contains a listing of controlled items, which includes motor vehicles.]

    \*     \*     \*     \*     \*     \*

**3–6. RECORDING PURCHASES:**

a. CAB Form 76, Purchase Control Log. All customers making purchases in excess of $1 in on-base retail outlets must sign a CAB Form 76 if a purchase record is not completed....

    \*     \*     \*     \*     \*     \*

b. Purchase Records (PHILGEN Form 10140/6/8). These forms are used to record purchases. Customers are required to verify the accuracy of the form and sign it with their payroll signature.

c. Refund Documents. Customers who return controlled or high-value items for refund will make sure a copy of the refund document is placed in their MC records. (Items costing $25 or more are considered high-value items.)

    \*     \*     \*     \*     \*     \*

5–2. ACQUISITION. Motor vehicles will be acquired in the RP only in the following ways:

*  *  *  *  *  *

c. Purchase from an authorized tax-exempt and duty-free outlet upon prior written approval of the MCO.

*  *  *  *  *  *

5–3. DISPOSITION OF MOTOR VEHICLES. Motor vehicles and major components will be disposed of in the RP only in the following ways....

a. Transfer to another tax-exempt individual by transacting a bill of sale (PHILGEN Form 5800/5A, Deed of Absolute Sale) at Merchandise Control....

*  *  *  *  *  *

6–1. MERCHANDISE CONTROL VIOLATIONS. Military personnel who violate this regulation are subject to disciplinary action under the UCMJ.... The following acts are prohibited and are violations of this regulation:

*  *  *  *  *  *

o. The sale or disposition of tax-exempt property to individuals or other entities not authorized tax-exempt privileges.

*  *  *  *  *  *

s. Failing to show proper possession or disposition of tax-exempt items when requested to do so by the MCO or his/her representatives, the AFOSI, or the Security Police.

*  *  *  *  *  *

x. Any other act, or attempted acts, used to circumvent the provisions of the CINCPACREPPHIL Instruction 4066.7Q or this regulation.